IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

David Efron,

           Plaintiff,

           v.

UBS Financial Services
Incorporated,

           Defendant.

Civil No. 24-1168 (GMM)

## OPINION AND ORDER

Before the Court is Defendant *UBS Financial Services, Inc.'s Motion to Dismiss* ("Motion to Dismiss"). (Docket No. 18). UBS Financial Services, Inc. ("UBS") seeks the dismissal of Plaintiff David Efron's ("Efron") *Complaint*, primarily on *res judicata* grounds. For the following reasons the Court **GRANTS** UBS' Motion to Dismiss.

## I.    RELEVANT FACTUAL BACKGROUND

For the purposes of this motion, the Court assumes the facts in the *Complaint* are true. A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 79 (1st Cir. 2013).

A.    The Candelario v. Efron Litigation

On May 4, 2001, the marriage between Efron and Madeleine Candelario ("Candelario") ended in divorce when the Court of First Instance of Puerto Rico ("State Court") entered a judgment dissolving Efron's marriage to Candelario. (Docket No. 1 at 5). Ever since, they have been embroiled in litigation in the State

Civil No. 24-1168 (GMM)
Page -2-

Court concerning the division of their marital assets. ("the *Candelario v. Efron* litigation"). After shuttling between Puerto Rico trial and appellate courts in the early 2000s, Candelario received a judgment ordering Efron to pay her $50,000 monthly until the marital estate was divided up. (Id. at ¶ 9); *see also* Candelario Del Moral v. UBS Fin. Services Inc. of Puerto Rico, 699 F.3d 93, 95 (1st Cir. 2012). On or about January 21, 2002, the year after the divorce, Efron opened an investment account with what was then UBS Paine Webber's office located in San Juan, Puerto Rico. (Id. at 6 ¶ 10). UBS required Efron to be bound by the terms and conditions of an "Account Application and Agreement for Individuals, their Estates, Trusts and Custodial Accounts" which is referred to a Master Account Agreement. (Id.). Efron alleges that the Master Account Agreement was not disclosed to him. (Id.). On or about October 18, 2022, Efron also opened a repurchase account with UBS. The funds in that account were comprised of loans made by UBS to Efron. (Id. at ¶ 12). While in the process of opening that repurchase account with UBS, Efron also agreed to be bound by the terms and conditions of a Master Account Agreement. (Id. at ¶ 13).

In early 2005, as part of the Candelario v. Efron litigation, the State Court ordered that Efron only had to disclose financial information to Candelario for the years 1997 through 2001, up through the date of their divorce. On August 22, 2005, the State

Court issued a subpoena for the production of documents to UBS commanding it to produce documents and information related to Efron but limited to the period of time from September 9, 1983, until June 4, 2001, the date the divorce decree became final and unappealable. (Id. at 7 ¶ 15). As a result, in 2004, UBS produced records relating to Efron's accounts to Candelario. (Id. at ¶ 16).

In October of 2006, the State Court issued an Order and Writ of Execution providing, amongst other things, for the attachment of Efron's real and private property. (Id. at 9 ¶ 23). Pursuant to that Order, third parties were to retain property and to remit to the State Court funds sufficient to satisfy the principal sum of $4,160,522.61. (Id. at ¶ 24). UBS was served with the Order and Writ of Execution and attached Efron's accounts. UBS froze all of Efron's accounts that same day. (Id. at ¶ 25). Subsequently, Efron moved to set aside the Order and Writ of Execution, and a hearing was scheduled for November 13, 2006. (Id. at ¶ 26). Following that hearing, the judge, ruling from the bench, vacated the attachment order for two reasons: first, because the amount attached appeared to exceed what Efron actually owed, and, second, because another judge was already handling issues related to the division of marital property. (Id. at ¶ 27). The judge's verbal ruling vacating the Order and Writ of Execution was memorialized in the Court's minutes. (Id. at ¶ 28). The judge's oral ruling sparked yet another series of pitched battles in the State Court. See Del Moral v. UBS

<u>Fin. Services Inc. of Puerto Rico</u>, Civil No. 08-1833 (PAD), 2016 WL 1275038, at *3 (D.P.R. Apr. 6, 2016).

At the end of February of 2007, Candelario's attorney again requested that UBS keep Efron's accounts frozen since the court's minutes containing the judge's verbal order vacating the Order and Writ of Execution had not been properly "notified." (<u>Id.</u> at 10 ¶ 33). In May of 2007, Candelario petitioned the State Court to reinstate the vacated Order and Writ of Execution. (<u>Id.</u> at ¶ 35). However, UBS had already released the restraints on Efron's accounts on February 10, 2007, unbeknownst to Candelario. (<u>Id.</u> at ¶ 32). Ultimately, the State Court granted Candelario's request to reinstate the Order and Writ of Execution and further ordered UBS in August of 2007 "to immediately sell and liquidate" the securities in three of Efron's three (3) accounts "up to the amount of $4,160,522.61" and to issue Candelario a check promptly after doing so. (<u>Id.</u> at ¶ 36). In September of 2007, UBS liquidated Efron's three accounts and used a part of the proceeds to pay off a line of credit which remained in the amount of $804,043. (<u>Id.</u> at ¶ 37). UBS then sent the remaining balance of $351,783.19 to Candelario. (<u>Id.</u> at ¶ 38).

B.   <u>The Candelario v. UBS Litigation</u>

Thereafter in August of 2008, Candelario sued UBS before this Court for negligently releasing Efron's funds and paying off his

credit-line account. (Id. at ¶ 39).[1] This, after UBS, at Efron's urging, treated the State Court's attachment as void and dispersed the bulk of the funds. *See* In re Efron, 746 F.3d 30, 33 (1st Cir. 2014). In her lawsuit against UBS, Candelario sought a judgment of $3,808,739 representing the difference between the $4,160,522 attachment amount and the $351,783 she received from UBS. (Id. at 11 ¶ 40). Efron moved to intervene as of right in the Candelario v. UBS litigation and Candelario opposed. (Id.). The Court ultimately denied Efron's intervention and the First Circuit affirmed the decision. (Id.). *See* In re Efron, 746 F.3d 30 (1st Cir. 2014).

Subsequently, on January 13, 2010, this Court ruled that UBS acted negligently when it released Efron's accounts based upon the minutes of the State Court which contained the judge's verbal order vacating the Order and Writ of Execution. (Id. at ¶ 41). In addition, the Court granted Candelario's request for summary judgment on the issue of damages and ordered UBS to pay Candelario

---

[1] The litigation generated eight published opinions describing and discussing different aspects of the case filed in federal court. *See* Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 691 F.Supp.2d 291 (D.P.R. 2010)("Candelario I"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 703 F.Supp.2d 79, 83 (D.P.R. 2010)("Candelario II"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 815 F.Supp.2d 495, 508 (D.P.R. 2011)("Candelario III"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 699 F.3d 93 (1st Cir. 2012)("Candelario IV"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 290 F.R.D. 336 (D.P.R. 2013)("Candelario V"); In Re Efrón, 746 F.3d 30 (1st Cir. 2014)("Candelario VI"); Candelario del Moral v. UBS Financial Services Inc. of Puerto Rico, 81 F.Supp.3d 143, 146-147 (D.P.R. 2014)("Candelario VII"); and Del Moral v. UBS Fin. Servs. Inc. of Puerto Rico, No. CV 08-1833 (PAD), 2016 WL 1275038, at *1 (D.P.R. Apr. 6, 2016).

the sum of $3,808,739 plus 10% interest backdated to the date in 2001 when Efron was first ordered to start making monthly payments to Candelario. (Id. at ¶ 42).

On June 4, 2010, UBS moved to set aside the damages award issued by the federal district court in favor of Candelario. (Id. at ¶ 44). The Court denied UBS' request to reopen the discovery yet amended the judgment to reflect that evidence showed that Candelario had received payments of $1,002,640.002 from Efron from 2001 through 2010. (Id. at 12 ¶ 47). On November 9, 2012, the First Circuit vacated the summary judgment granted in favor of Candelario and remanded the case back to this Court, for a jury to decide whether UBS' conduct in releasing Efron's funds, based upon the minutes of the State Court vacating the Order and Writ of Execution, was reasonable. (Id. at ¶ 48). *See* Candelario Del Moral v. UBS Fin. Services Inc. of Puerto Rico, 699 F.3d 93 (1st Cir. 2012). Thereafter, on March 31, 2016, after a bench trial the Court found by a preponderance of the evidence that:

- UBS was negligent: its decision to release the accounts to Efron unreasonably overlooked the risk of loss to Candelario.

- UBS' negligence caused damages to Candelario: as of today, those damages amount to $4,725,629.00.

- Candelario was not negligent and no downward adjustment is required in the amount that UBS must pay her.

Civil No. 24-1168 (GMM)
Page -7-

- Candelario's action was not time-barred.

- Even though UBS was negligent, it was not
  obstinate or vexatious to the point of
  justifying an award of attorney's fees and
  prejudgment interest against it.

(Id. at ¶ 49); see Del Moral v. UBS Fin. Services Inc. of Puerto
Rico, Civil No. 08-1833 (PAD), 2016 WL 1275038, at *2 (D.P.R. Apr.
6, 2016).

On or about May 5, 2016, UBS entered into a post-judgment
settlement agreement with Candelario to settle the judgment and
her claims against UBS. (Id. at 13 ¶ 50). Accordingly, UBS paid
Candelario the amount of $4,450,000.00, pursuant to the terms of
the settlement. (Id. at ¶ 51).

C.   The UBS v. Efron Arbitration ("FINRA arbitration")

Seeking to recover its payment to Candelario, UBS initiated
the first arbitration hearing in 2018 ("2018 Arbitration Hearing")
through the Financial Industry Regulatory Authority ("FINRA")
against Efron. (Id. at 14 ¶ 56). Pursuant to the Master Account
Agreement, UBS claimed contractual indemnification, unjust
enrichment, and equitable contribution, in addition to more than
$4,500,000 in attorneys' fees. (Id.). On April 26, 2017, Efron
filed his Respondent's Answer, Affirmative Defenses, and
Counterclaims in Response to the Statement of Claim
("Counterclaim"), where he asserted negligence, breach of implied
contract, and breach of fiduciary duty in connection with the 2005

production of account records and 2007 liquidation of his accounts by UBS. (<u>Id.</u> at 14-15 ¶ 57, Footnote 2).

The 2018 Arbitration Hearing resulted in an $9.7 million award in favor of UBS, that was later vacated by the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida. (<u>Id.</u> at 14-15 ¶ 57). As part of the award issued on May 17, 2018, Efron's Counterclaim was dismissed as "ineligible for arbitration under Rule 12206 of the FINRA Code of Arbitration Procedure [which] provides that '[n]o claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim.'" (<u>Id.</u> at 14-15 ¶ 57, Footnote 2). On appeal, Florida's Third District Court of Appeal reversed due to the initial panel's denial of Efron's second motion to postpone the 2018 Arbitration Hearing. The parties were then ordered to proceed with an arbitration rehearing. *See* <u>UBS Fin. Services Inc. of Puerto Rico v. Efron</u>, No. 1:22-CV-23924-DPG, 2023 WL 8412592, at *1 (S.D. Fla. Sept. 25, 2023).

In the meantime, in 2019, Efron filed another lawsuit before this Court and sought to bring a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim and various Puerto Rico law claims against UBS, alleging that they illegally disclosed his private bank account information to his ex-wife. *See* <u>Efron v. UBS Fin. Services Inc. of Puerto Rico</u>, 96 F.4th 430, 433 (1st Cir. 2024).

Civil No. 24-1168 (GMM)
Page -9-

That is, based on the 2005 production of account records to
Candelario, the 2007 liquidation of his accounts, and UBS's efforts
to seek indemnification—which at the time had resulted in the
initial 2018 arbitration award that was later vacated— Efron
contends that UBS's disclosure triggered extensive litigation over
Candelario's entitlement to Efron's assets held by UBS and
eventually led to UBS seeking millions in indemnification from
Efron. Efron v. UBS, 96 F.4th at 433. On September 29, 2021, the
district court entered an order dismissing Efron's case. The First
Circuit affirmed this decision in March 2024, concluding that he
failed to plausibly claim predicate acts of mail or wire fraud
under RICO. (Docket No. 1 at 14-15 ¶ 57, Footnote 2).

Back in the FINRA arbitration, a rehearing was held from
August 29 to September 2, 2022 (the "2022 Arbitration Hearing"),
before a new panel of FINRA arbitrators (the "2022 Panel"). (Id.
at 14-15 ¶ 57). The 2022 Panel issued an award in favor of UBS for
a total amount of $6,480,854.80 on November 2, 2022 (the "2022
Award"). (Id.) UBS then filed an action to confirm the 2022 Award
in the Miami-Dade Circuit Court. Efron then removed the action to
the U.S. District Court for the Southern District of Florida on
December 1, 2022. On January 25, 2023, Efron's Motion seeking to
vacate the 2022 Award was filed. (Id.) On the other hand, UBS filed
a *Motion to Confirm Arbitration Award*.

Civil No. 24-1168 (GMM)
Page -10-

On September 25, 2023, District Court for the Southern District Florida granted UBS's motion, confirmed the 2022 Award and denied Efron's motion to vacate. (Docket No. 18 at 9). Efron appealed the decision, which is pending before the Court of Appeals for the Eleventh Circuit. (Id.).

## II.  RELEVANT PROCEDURAL BACKGROUND

On April 5, 2024, Efron filed a Complaint in this Court against UBS, claiming breach of contract, breach of implied contract, breach of fiduciary duty, violation of the constitutional right of privacy, "contract detrimental to a third party" and seeking declaratory judgment and damages. (Docket No. 1). Efron alleges that "UBS negligently disclosed private financial information of Efron, its customer in the Puerto Rico office, to his ex-wife in violation of a Puerto Rico Court order, federal law and regulations and UBS' own policies." (Id. at 4). He also claims that UBS improperly "seek[s] indemnification from Efron, its customer, for damages UBS paid to a third party resulting exclusively from its negligence and that of its attorneys, as twice determined by this Court." (Id.). Efron states that he "seeks relief from this Court for the damages caused by the reckless and negligent conduct of UBS in violation of the agreement, and the legal and regulatory duties embedded in it, and [sic] that UBS required Efron to sign when he opened his investments account with UBS in 2002." (Id.). He claims that UBS

negligently executed an order of garnishment when liquidating and delivering to Candelario the balance of its accounts instead of depositing the balance in the Court. (Id. at 16 ¶ 62). Efron also alleges that "UBS breached its contractual obligations with Efron by attempting to fraudulently seek indemnification from him for sums of money paid by UBS exclusively as a result of its own negligent conduct." (Id. at 16 ¶ 63). "This breach of contract includes, but is not limited, UBS's filing and prosecution of arbitration proceedings against Efron, attempting to excuse its own negligent conduct and seeking indemnification by fraudulently enforcing an indemnification provision against Efron that is invalid." (Id. at 16 ¶ 64). To this extent, Efron argues that the Master Account Agreement, was never disclosed to him by UBS. (Id. at 6 ¶ 10, 13; 25 ¶ 101).

After the Court granted an extension of time, UBS filed its Motion to Dismiss on May 29, 2024. (Docket Nos. 9; 18). First, UBS claims that Efron once again brings similar claims, "[l]ess than one month after the First Circuit affirmed the dismissal of his last lawsuit against UBS". (Docket No. 18 at 6); see Efron v. UBS Fin. Services Inc. of Puerto Rico, 96 F.4th 430, 433 (1st Cir. 2024). UBS argues that Efron now seeks, again, to collaterally attack the 2022 Arbitration Award requiring him to indemnify UBS under the terms of his Master Account Agreement, an award which was confirmed in September 2023 by the Court in the Southern

District of Florida. (Docket No. 18 at 6). According to UBS, Efron "jettisons Efron's prior allegations that the arbitration was part of a purported 'RICO' conspiracy" and is "estopped from pursuing claims relating to the subject matter of the arbitration under well-settled principles of *res judicata* and collateral estoppel." (Id.). UBS argues that Efron is thus precluded from asserting claims related to such matters, including UBS's 2016 settlement payment to his ex-wife, UBS's claim seeking contractual indemnification, or Efron's defenses to that claim. (Id.).

UBS further argues that all but one of Efron's causes of action, Count IV of the Complaint, are explicitly based, in whole or part, on the subject matter of the FINRA arbitration, that is, UBS's 2016 settlement with Candelario; UBS's efforts to seek indemnification under the terms of the Master Account Agreement; and the interpretation, performance or breach of the Master Account Agreement. (Id. at 13). UBS also adds that the only matters not precluded are Efron's claims relating to UBS's 2005 production of account records to Candelario and its 2007 liquidation of Efron accounts. (Id.).

However, UBS emphasizes that Efron's Counterclaim filed during the FINRA arbitration was dismissed as untimely and was thus deemed as ineligible for arbitration. (Id.). To this extent, UBS argues that those claims cannot proceed before this Court because they are subject to an arbitration agreement. (Docket No.

Civil No. 24-1168 (GMM)
Page -13-

18 at 15). The Master Account Agreement provides that "any and all
controversies which may arise between [UBS], any of [UBS's]
employees or agents, and [Efron] concerning any account,
transaction, dispute or the construction, performance or breach of
this Agreement or any other agreement, whether entered into prior
to, on or subsequent to the date hereof, shall be determined by
arbitration." (Id. at 15-16; 18-2 at 17). Also, in the FINRA
Submission Agreement which Efron executed after UBS filed its
statement of claim, Efron agreed to "submit the present matter in
controversy, as set forth in [UBS's] statement of claim, [Efron's]
answers, and all related. . .counterclaims. . .which may be
asserted, to arbitration in accordance with the FINRA By-Laws,
Rules, and Code of Arbitration Procedure." (Docket No. 18 at 16;
18-3 at 2). Therefore, UBS postulates that even in the unlikely
event that the FINRA award were vacated by the Eleventh Circuit
appeal, the Court should stay the litigation and compel arbitration
before FINRA of Efron's claims relating to the subject matter of
the arbitration.

In addition, UBS posits that Efron asserts claims based on
the 2005 production of account records to Candelario, and the 2007
court-ordered liquidation of his UBS accounts. To this extent, UBS
states that Efron concedes that these claims were dismissed by the
arbitrators as untimely and ineligible for arbitration. Thus, UBS
asserts that those claims must also be dismissed because they are

subject to a forum-selection clause in the Master Account Agreement which requires claims ineligible for arbitration to be filed in New York. (Docket No. 18 at 7, 17-18).

Moreover, UBS contends that even if the Court were to reach the merits, Efron's claims must be dismissed because according to the Master Account Agreement's choice of law provision the applicable law is New York law. (Id. at 19). Hence, under New York law, UBS posits, Efron's claims of breach of contract, breach of implied contract, and breach of fiduciary duty, which are based on UBS's 2005 production to Candelario and the 2007 liquidation of his accounts, are time barred. (Id. at 23). Under this same theory, UBS argues that Puerto Rico law claims included in Counts IV and V, should also be dismissed because they are not available under New York law, or otherwise time-barred under Puerto Rico law. (Id. at 23-24).

On July 12, 2024, Efron filed his *Opposition to Motion to Dismiss* ("Opposition"). (Docket No. 22). In his Opposition, Efron argues that the District Court for the Southern District of Florida did not decide the merits of the same claims filed in this litigation in the case UBS Fin. Servs. v. Efron, No. 1:22-CV-23924-DPG, 2023 WL 8412592 (S.D. Fla. Sept. 25, 2023). Efron posits, that the Court only managed the appeal of the 2022 Award related to the FINRA arbitration. (Id. at 2). Efron concedes that in the FINRA arbitration he "filed counterclaims that mirror some

of the claims filed in the Complaint of this case." (Id. at 2-3).
However, he argues that since the FINRA panel determined in 2018
that pursuant to FINRA Rule 12206(a), claims are not "eligible for
submission to arbitration under the Code where six years have
elapsed from the occurrence or event giving rise to the claim[s],"
this determination "does not mean that the claims cannot proceed
in Court."  (Id. at 3). Moreover, Efron argues that New York law
is not applicable to his claims against UBS because "the Southern
District of New York is not a forum agreed to by Efron or that has
any relation with the activities involved in the underlying facts
of this case." (Id. at 3-4). To this point, Efron argues that
"FINRA rules have categorically prohibited broker-dealers, like
UBS, to insert in the customer account agreements the law or a
forum of a place that has no relation with the customer and the
account." (Id. at 4). He adds, that by making New York law
applicable, UBS is restricting his rights, since the statute of
limitations for the claims filed in this action under the law of
New York is shorter than the statute of limitations applicable
under Puerto Rico law.

Furthermore, Efron contends that UBS does not question the
sufficiency of the allegations in the Complaint and merely relies
on the doctrine of claim preclusion. To this extent, he argues
that "the lone matter before the arbitrators was Efron's
contractual duty to indemnify UBS for the settlement payment UBS

made to Candelario as a result of UBS's own negligence" and that
none of the claims filed in this action involve the validity of
the indemnification provision in the Master Account Agreement.
(Id. at 8). Further, that UBS omits that none of the claims raised
in this action have been previously litigated to a final judgment
and that under Puerto Rico law, the 2022 Award is not final for
the purposes of *res judicata* since it is pending appeal. (Id. at
9-10).

In addition, in his Opposition, Efron contends that he was
never provided a copy of the Master Account Agreement, and that
the forum selection and choice of law clause "were the product of
surreptitious conduct on the part of UBS." (Id. at 12). Under a
different argument, he poses the Master Account Agreement is a
contract of adhesion. (Id.). Therefore, Efron posits that the
Master Account Agreement is unenforceable because it is
unreasonable and unjust. (Id. at 12-14). Additionally, Efron
asserts that "the contractual indemnification clause in the MAA
that UBS sought to enforce in the FINRA Arbitration is illegal,
null and void under Puerto Rico law." (Id. at 15). He adds: "[i]n
this case, UBS's enforcement of the indemnification clause in the
[Master Account Agreement], and its attempt to use the New York
choice of law provision in the same agreement, would effectively
deprive Efron of his rights under Puerto Rico law." (Id. at 18).

Civil No. 24-1168 (GMM)
Page -17-

Additionally, Efron argues that the State Court's liquidation order does not preclude his claims and that he "will show that what UBS had to do was deposit any liquid funds with the Court's registry instead of cutting a check to Candelario directly." (Id. at 25). He also argues that UBS is judicially estopped from arguing that Puerto Rico law does not apply to claims asserted by its Puerto Rico branch customers. (Id. at 22).

The Motion to Dismiss is thus fully briefed.

### III. LEGAL STANDARD

A.    Fed. R. Civ. P. 12(b)(6)

Pursuant to Rule 12(b)(6), the Court can dismiss an action if it fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Dismissal is proper when "it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." Gonzalez-Morales v. Hernandez-Arencibia, 221 F.3d 45, 48 (1st Cir. 2000) (*quoting* Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49. 52 (1st Cir. 1990)); *see also* Torres v. Bella Vista Hosp., Inc., 523 F.Supp.2d 123, 132 (D.P.R. 2007). To survive a Rule 12(b)(6) motion, the complainant must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "To assess whether a complaint can withstand a Rule 12(b)(6) motion, we 'must accept as true all well-pleaded facts indulging all reasonable inferences in [Plaintiff's] favor.'" Wadsworth v.

Nguyen, No. 23-1463, 2025 WL 547405, at *16 (1st Cir. 2025)
(*quoting* Rae v. Woburn Pub. Schs., 113 F.4th 86, 98 (1st Cir.
2024)).

While a claim need not contain detailed factual allegations
to withstand dismissal, a claimant's "obligation to provide the
grounds of his entitlement to relief requires more than labels and
conclusions, and a formulaic recitation of the elements of a cause
of action will not do." Twombly, 550 U.S. at 555 (internal citation
omitted). The Court need not accept as true legal conclusions or
"'naked assertions' devoid of 'further factual enhancement.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (*quoting* Twombly, 550
U.S. at 557) (internal alteration omitted); *see also* Maldonado v.
Fontanes, 568 F.3d 263, 267 (1st Cir. 2009). The claimant must
allege enough factual content to nudge a claim across the line
from conceivable to plausible. Iqbal, 556 U.S. at 680. The claimant
must show more than the "sheer possibility that an [opposing party]
has acted unlawfully." Id. at 678. The Court's assessment of the
pleadings is context-specific, requiring the court "to draw on its
judicial experience and common sense." Id. at 679. The Court may
not dismiss a claim based on disbelief of its factual allegations
or on a forecasted likelihood of success on the merits. *See* Rivera-
Torres v. Castillo, 109 F.Supp.3d 477, 480 (D.P.R. 2015). "A well
pleaded complaint may proceed even if. . .recovery is very remote
or unlikely." Twombly, 550 U.S. at 556.

In evaluating motions under Rule 12(b)(6), the Court may consider documentary evidence that has been fairly incorporated to the pleadings. *See* Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (citations omitted); Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993) (citations omitted). This includes documents as to which authenticity is not disputed, documents central to plaintiff's claims, documents sufficiently referred to in the complaint, and official public records. Curran, 509 F.3d at 44 (citations omitted). "When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998).

Furthermore, in appropriate cases an "affirmative defense may be adjudicated on a motion to dismiss for failure to state a claim." U.S. v. Raytheon Co., 334 F.Supp.3d 519, 523 (D. Mass. 2018) (*quoting* Banco Santander de P.R. v. Lopez-Stubbe et. al, 324 F.3d 12, 16 (1st Cir. 2003)). "The affirmative defense of *res judicata* is no exception". Id. Dismissal under *res judicata*, however, can only occur where the facts that establish the defense are conclusive and definitively ascertainable from: (1) the allegations of the complaint; (2) the documents (if any)

Civil No. 24-1168 (GMM)
Page -20-

incorporated therein; (3) matters of public record; and (4) other matters of which the court may take judicial notice. Id.

If a Rule 12(b)(6) motion to dismiss "is premised on a defense of *res judicata*. . .the court may take into account the record in the original action." Thomas v. Intl. CDL Tractor Trailer Training, LLC, No. 1:24-CV-00241-MSM-LDA, 2025 WL 295782, at *2 (D.R.I. Jan. 24, 2025) (*citing* Andrew Robinson Intern., Inc. v. Hartford Fire Ins., 547 F.3d 48, 51 (1st Cir. 2008)); *see also* R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 183-84 (1st Cir. 2006); Boateng v. InterAm. Univ., 210 F.3d 56, 60 (1st Cir. 2000)).

In the same manner, in the First Circuit, a motion to dismiss based on a forum selection clause is considered under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Bautista Cayman Asset Co. v. Rivera, Civil No. 16-1672 (GLS), 2024 WL 4041665, at *1 (D.P.R. Sept. 4, 2024) (*citing* Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009)).

### IV.  APPLICABLE LAW AND ANALYSIS

A.  *Res Judicata* Effect of Arbitral Awards

"The doctrine of claim preclusion, or *res judicata*, prohibits parties from contesting issues that they have had a 'full and fair opportunity to litigate.'" Brown v. Synchrony Fin. Services Co., No. 24-CV-11553-AK, 2025 WL 360798, at *1 (D. Mass. Jan. 31, 2025) (*quoting* Taylor v. Sturgell, 553 U.S. 880, 892 (2008)). The doctrine has a "dual purpose of protecting litigants from the

burden of relitigating an identical issue with the same party or
his privy and of promoting judicial economy by preventing needless
litigation." Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 329 (1st
Cir. 2009) (*quoting* Parklane Hosiery Co. v. Shore, 439 U.S. 322,
326(1979)).

"*Res judicata* applies with equal force to arbitration: 'a
valid and final award by arbitration has the same effects under
the rules of *res judicata*, subject to the same exceptions and
qualifications, as a judgment of a court.'" Certain Underwriters
at Lloyd's, London v. Cent. Indem. Co., No. 18-CV-12041, 2020 WL
1083360, at *3 (D. Mass. Mar. 6, 2020) (*quoting* Hopkinton Drug,
Inc. v. CaremarkPCS, LLC, 77 F.Supp.3d 237, 254 (D. Mass. 2015)).

In the context of claim preclusion resulting from prior
arbitration proceedings, an arbitral award has a preclusive *res
judicata* effect "as to all claims heard by the arbitrators."
FleetBoston Fin. Corp. v. Alt, 638 F.3d 70, 79 (1st Cir. 2011)
(*quoting* Apparel Art Int'l, Inc. v. Amertex Enters. Ltd., 48 F.3d
576, 585 (1st Cir. 1995)). "Final arbitral awards are entitled to
the same preclusive effect as state court judgments, at least as
concerns claims and issues actually raised." Wolf v. Gruntal &
Co., 45 F.3d 524, 528 (1st Cir. 1995). "The arbitration panel ha[s]
no duty to set forth their reasoning for the award, and its choice
not to do so 'does not render [the] final settlement ambiguous as
to the resolution of the matters in controversy.' Nor does the

panel's choice bar application of *res judicata*." <u>FleetBoston Fin.
Corp.</u>, 638 F.3d at 80 (*citing* <u>Bernhardt v. Polygraphic Co. of Am.</u>,
350 U.S. 198, 203 (1956) and *quoting* <u>Pujol v. Shearson/Am. Express,
Inc.</u>, 829 F.2d 1201, 1206 (1st Cir. 1987)) (internal citations
omitted). The First Circuit has recognized that for this reason
there may be difficulties in applying *res judicata* to arbitral
awards: "In light of the complexities of applying the traditional
*res judicata* doctrine to arbitration awards, it has been suggested
that courts have discretion as to whether issue preclusion is
appropriate." <u>Id.</u> at 80.

An earlier judgment, or arbitral award, is entitled to such
a preclusive effect if: (1) the prior action resulted in a final
judgment on the merits; (2) the causes of action alleged in the
subject actions are sufficiently identical; and (3) the parties
are likewise sufficiently identical or closely related. <u>Graphic
Builders LLC v. RCM Modular, Inc.</u>, 646 F.Supp.3d 303, 306 (D. Mass.
2022) (*citing* <u>FleetBoston Fin. Corp.</u>, 638 F.3d at 79).

To find sufficient identicality between the causes of action
in the earlier and later suits, the Court need "not focus on the
labels or sources for the plaintiff's causes of action but instead
consider[ ] whether the underlying factual bases for the causes
are related in time, space, origin or motivation." <u>DeLima v.
Google, Inc.</u>, 561 F.Supp.3d 123, 132 (D.N.H. 2021) (*quoting* <u>Silva
v. City of New Bedford</u>, 660 F.3d 76, 79 (1st Cir. 2011). The

"required relationship" will be found if both sets of claims "derive from a common nucleus of operative facts." Id.; *see also* Kale v. Combined Ins. Co. of Am., 924 F.2d 1161, 1166 (1st Cir. 1991) (to find sufficient identity between two causes of action, the court asks whether they "were sufficiently related, that is, if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong."). "Even claims based upon different legal theories are barred provided they arise from the same transaction or occurred." Malcom v. Board of Educ. of Honeoye Falls-Lima Cent, 506 Fed. Appx. 65, 69 (*quoting* Berrios v. N.Y.C. Hous. Auth., 564 F.3d 130, 135 (2d Cir. 2009)) (internal quotation marks omitted); *see* Sure-Snap Corp. v. State St. Bank & Trust Co., 948 F.2d 869, 875 (2d Cir. 1991) ("A party may not avoid the preclusive effect of *res judicata* by asserting a new theory of a different remedy.")

Before this Court is Efron's Complaint against UBS alleging: breach of contract (Count I); breach of implied contract (Count II); breach of fiduciary duty (Count III); violation of privacy right (Count IV); "contract detrimental to a third party" (Count V); and seeking declaratory judgment and damages (Count VI). UBS seeks dismissal of those claims on grounds of *res judicata*, considering the federal court decision confirming the 2022 Award rendered in the FINRA arbitration.

Civil No. 24-1168 (GMM)
Page -24-

    In reviewing the preclusive effect, as to the requisite of
sufficient identicality between the parties in the two suits, this
element is clearly met, as both Efron and UBS are parties to the
FINRA arbitration and in the subsequent action in the federal court
confirming the 2022 Award.

    As to the first prong —a final judgment on the merits in an
earlier suit— the Court notes that on September 25, 2023, the
District Court for the Southern District Florida confirmed the
2022 Award. *See* UBS Fin. Services Inc. of Puerto Rico v. Efron,
No. 1:22-CV-23924-DPG, 2023 WL 8412592 (S.D. Fla. Sept. 25, 2023).
Efron appealed the decision, which is pending before the Court of
Appeals for the Eleventh Circuit. To this point, Efron argues that
judgment is not final and thus cannot have preclusive effect.
However, the applicable law clearly states otherwise.

    "Federal law determines whether an earlier judgment, rendered
in federal court, bars the maintenance of a subsequent federal
court action." DeLima, 561 F.Supp.3d at 132 (*citing* In re Colonial
Mortg. Bankers Corp., 324 F.3d 12, 161 (1st Cir. 2003)). In other
words, federal law governs the *res judicata* effect of a prior
federal court judgment. *See* Swaida v. Gentiva Health Servs., 238
F.Supp.2d 325, 327 (D. Mass. 2002). "It is well settled that in
the federal courts the pendency of an appeal does not destroy the
*res judicata* effect of a judgment." Taunton Gardens Co. v. Hills,
557 F.2d 877, 879, n.2 (1st Cir. 1977); *see also* Wright & Miller,

Civil No. 24-1168 (GMM)
Page -25-

Federal Practice and Procedure, § 4433 Finality — Appeals Forgone,
Pending, or Unavailable, 18A Fed. Prac. & Proc. Juris. § 4433 (3d
ed.) ("The bare act of taking an appeal is no more effective to
defeat preclusion than a failure to appeal. The Supreme Court long
ago seemed to establish the rule that a final judgment retains all
of its *res judicata* consequences pending decision of the appeal,
apart from the virtually nonexistent situation in which the
'appeal' actually involves a full trial de novo. The lower courts
have taken the rule as settled ever since."). Hence, "[a] decision
retains its 'finality' for preclusion purposes even while an appeal
from that decision is pending." Rodriguez-Miranda v. Coquico,
Inc., No. CIV. 10-1557 JAF, 2011 WL 2292263, at *5 (D.P.R. June 7,
2011) (*citing* In re President & Fellows of Harvard College, 149
F.2d 69, 73 (1st Cir. 1945)).

As to the second prong, the Court compares the claims in the
FINRA arbitration against the claims brought before this Court to
ascertain if the causes of action alleged in the subject actions
are sufficiently identical. As summarized by the District Court
for the Southern District of Florida, the FINRA arbitration came
because of "[a] divorce proceeding between Efron and his ex-wife
resulted in the ex-wife receiving a favorable money judgment. The
ex-wife initiated an action against UBS to satisfy the money
judgment, and UBS was required to pay a post-judgment settlement."
UBS Fin. Services Inc. of Puerto Rico v. Efron, No. 1:22-CV-23924-

Civil No. 24-1168 (GMM)
Page -26-

DPG, 2023 WL 8412592, at *1 (S.D. Fla. Sept. 25, 2023).[2] Seeking to recover its payment to the ex-wife, UBS initiated a FINRA arbitration against Efron for contractual indemnification, unjust enrichment, and equitable contribution. In arbitration, Efron filed a Counterclaim and asserted negligence, breach of implied contract, and breach of fiduciary duty. Id.

A further review of the FINRA arbitration record— of which the Court takes judicial notice since they are public records and are undisputed documents referenced in the Complaint— establishes not only that Efron's claims in this Court emerge from the same nucleus of operative facts as the FINRA arbitration, but that almost all of the allegations in his Complaint were asserted in the arbitration proceedings. Although in his Opposition Efron alleges that "the lone matter before the arbitrators was Efron's contractual duty to indemnify UBS for the settlement payment UBS made to Candelario as a result of UBS's own negligence," his

_____

[2] The case summary included in FINRA arbitration 2022 award, similarly indicates:

> Claimant [UBS] asserted the following causes of action: contractual indemnification; unjust enrichment; and equitable contribution. The causes of action relate to a post-judgment settlement payment that Claimant made to Respondent's ex-wife following litigation ("the Candelario litigation") in the U.S. District Court for the District of Puerto Rico.
>                              . . .
> In the Counterclaim, Respondent [Efron] asserted the following causes of action: negligence; breach of implied contract; and breach of fiduciary duty. The causes of action relate to Claimant's handling of Respondent's account subsequent to a ruling made in the Candelario litigation.

(Docket No. 18-1 at 3).

Civil No. 24-1168 (GMM)
Page -27-

allegations before this Court and before the FINRA arbitration show otherwise.

First, Count I of Efron's Complaint asserts a breach of contract claim that arises from UBS's efforts to seek indemnification for its payment to his ex-wife, which are the same set of facts litigated in the FINRA litigation. Specifically, Efron alleges: "This breach of contract includes, but is not limited, UBS's filing and prosecution of arbitration proceedings against Efron, attempting to excuse its own negligent conduct and seeking indemnification by fraudulently enforcing an indemnification provision against Efron that is invalid." (Docket No. 1 at 16 ¶ 64). Efron expressly questions the validity of the FINRA arbitration and sets forth allegations regarding the indemnification. Unambiguously, he alleges: "Moreover, UBS breached its contractual obligations with Efron by attempting to fraudulently seek indemnification from him for sums of money paid by UBS exclusively as a result of its own negligent conduct, as determined twice by this Court." (Docket No. 1 at 16 ¶ 63).

Clearly, the breach of contract claim relates to the Master Account Agreement with UBS, pursuant to which the 2022 Award was

rendered.[3] This is reflected in Efron's very own "Statement of Facts" in the Complaint. *See* (Docket No. 1 at 5-15).

The Court notes that the claim included in Count I is also based on identical facts that were also the subject of the extensive litigation in <u>Candelario v. Efron</u>. *See infra* I Factual Background.

As to Count II of the Complaint, Efron alleges breach of implied contract. Particularly, he claims that:

> UBS breached its aforementioned implied contract with Efron by improperly and negligently producing to Candelario records related to Efron's accounts with UBS in response to a subpoena issued by Candelario, in violation of multiple court orders issued in the divorce property distribution proceeding between Efron and Candelario stating that Candelario was not entitled to the discovery of any evidence related to Efron's assets after the year 2001 (the year the parties were divorced).

(<u>Id.</u> at 17 ¶ 70). Again, these allegations are the same facts involved in the State Court litigation and in the FINRA Arbitration. To wit, during the arbitration proceedings Efron brought identical allegations in Count II of the Counterclaim filed in response to UBS' claim. *See* (Docket No. 27-1 at 38-40).

Regarding Count III of the Complaint, Efron alleges UBS' breach of fiduciary duty pursuant to the Master Account Agreement. Specifically, he claims:

---

[3] "In accordance with the terms of the parties' Master Account Agreement, Respondent is liable for and shall pay to Claimant the sum of $1,501,000.00 in attorneys' fees and costs (excluding FINRA fees)." (Docket No. 18-1 at 4).

Civil No. 24-1168 (GMM)
Page -29-

> UBS breached its fiduciary duty to Efron when it (acting
> through its representatives) improperly and negligently
> produced Candelario records related to Efron's accounts
> with UBS in response to a subpoena issued by Candelario,
> in violation of multiple court orders issued in the
> divorce proceeding between Efron and Candelario stating
> that Candelario was not entitled to the discovery of any
> evidence related to Efron's assets after the year 2001
> (the year the parties were divorced).

(Docket No. 1 at 19 ¶ 61).  Once again, these allegations derive
from the same nucleus of operative facts. To this point, Efron
also included an identical claim with the exact allegations in
Count III of the Counterclaim filed in the FINRA Arbitration. *See*
(Docket No. 27-1 at 41-43). In addition, and in the pertinent part,
in his Complaint he addresses the 2022 Award and FINRA arbitration
in his claim for damages: "As a result of UBS' breaches of its
fiduciary duty owed to Efron, Efron has suffered damages including
but not limited to:. . .g. The considerable damage resulting from
UBS's attempts to seek indemnification from Efron for the
consequences of UBS's own negligent acts or omissions as determined
twice by this Court." (Docket No. 1 at 22 ¶ 83g).

Concerning Count IV of the Complaint, Efron alleges violation
his right to privacy. He posits that "[b]y negligently, illegally,
and in violation of a court order and its obligations to Efron,
sharing Efron's personal information with third parties, without
his consent or legal justification for it, UBS grossly failed to
comply with its duties to protect the privacy of its client." These
allegations were not directly addressed in the Counterclaim or in

Civil No. 24-1168 (GMM)
Page -30-

the State Court of federal litigation, but also arise from the
same set of facts, particularly the 2005 production of account
records and is related to the terms and conditions, as well as the
enforcement of the Master Account Agreement.

Relating to Count V, the Complaint alleges "Contract
detrimental to a third party." Efron claims that "UBS and
Candelario, when entering into the judicial settlement of the
litigation between them, agreed to a settlement detrimental to
Efron, who is a non-party in the aforementioned contractual
relationship but a directly affected party in the settlement."
(Docket No. 1 at 24 ¶ 95). Also, regarding the FINRA arbitration,
he posits that he suffered damages because of the "settlement
agreement ever since UBS obtained an arbitration award ordering
Efron to pay UBS the amounts incurred by UBS in the defense of
Candelario's legal claim, as well as the total sum of the
settlement amount that UBS paid to Candelario." (Id. at 24 ¶ 98).

In Count VI of his Complaint, Efron seeks declaratory
judgment. Specifically, he claims that "[t]here is a genuine
dispute between UBS and Efron about the nature of the contract
between the parties. Efron alleges that it is an adhesion contract,
therefore the terms and conditions that are not clear, such as the
so-called indemnity clause, must be interpreted in favor of Efron."
(Id. at 24 ¶ 100). Further, Efron also requests the Court declare
that "even if there exists an obligation of Efron to indemnify

Civil No. 24-1168 (GMM)
Page -31-

UBS, which Efron rejects and denies, that such compensation not include the excessive interest, expenses and attorneys' fees UBS incurred in the defense of its own negligence." (Id. at 26 ¶ 106). Clearly, through this claim, Efron directly attacks the basis and validity of UBS' indemnification claim pursuant to the Master Account Agreement, its interpretation, and the applicable law. These were precisely the issues at the center of the FINRA arbitration, decided in the 2022 Award, and confirmed in federal court.

With regards to Count VII of his Complaint, Efron asserts "Fraud in Compliance of Contract." He claims that "[i]n UBS signing the settlement agreement with Candelario under the assumption that Efron would indemnify it for the sums paid under the terms and conditions of the adhesion contract to open Efron's investment accounts with UBS, UBS incurred in fraudulent and deceitful behavior." (Docket No. 1 at 27 ¶ 115). Again, these allegations arise from the Master Account Agreement and mirror the facts and subject matter litigated and resolved in the FINRA arbitration.

As discussed earlier, arbitration proceedings and arbitral awards may sometimes be difficult to assess for *res judicata* purposes because arbitrators are not required to provide a full explanation for their decision. However, the underlying arbitration proceedings and the reasoning of the 2022 Award are set out with sufficient detail both in Efron's Complaint and

Civil No. 24-1168 (GMM)
Page -32-

Opposition, the record here and in the previous action. The FINRA arbitration concerned both UBS and Efron and resolved disputes arising from the Master Account Agreement. Particularly, the 2022 Award addressed the indemnification arising from the 2016 settlement between Efron's ex-wife and UBS, and the underlying litigation in State Court. The Court notes that although Efron alleges that the Master Account Agreement was never disclosed to him, he does not question its authenticity, the document is central to his claims, and it is also sufficiently referred to in the Complaint. Moreover, the FINRA arbitration and the 2022 Award revolves around the Master Account Agreement which was deemed valid. *See* (Docket No. 18-1).[4]

The Court notes that during the FINRA arbitration, the panel dismissed Efron's Counterclaim under Rule 12206 of the FINRA Code of Arbitration Procedure and deemed that claims contained therein as ineligible for arbitration on timeliness grounds. (Docket No. 1 at 15, Footnote 2). As a result, those claims were not considered. Hence, *res judicata* does not apply to claims which were submitted to arbitration but then found to be outside the remit of the arbitrator or otherwise "not properly arbitrable."

_____

[4]Furthermore, the Master Account Agreement was submitted as evidence during the FINRA arbitration, and the document contains Efron's signature below the text confirming "that I have received and read a copy of the attached Master Account Agreement". *See* (Docket Nos. 18-2 at 5).

Civil No. 24-1168 (GMM)
Page -33-

_Acciavatti v. Pro. Servs. Grp., Inc._, 982 F.Supp. 69, 80 (D. Mass.
1997).

Despite this, all the requisites of _res judicata_ are satisfied
as to most claims before the Court. The FINRA panel heard UBS'
claims against Efron arising out of the Master Account Agreement
and rendered a final judgment on all such claims. Moreover, a
federal court confirmed the 2022 Award. In addition, the very facts
and disputes raised in this litigation were largely addressed
during that arbitration and in the panel's 2022 Award. The same
underlying conduct and the same nucleus of operative facts were
the basis for UBS' claims and Efron's Counterclaim in arbitration,
and in Efron's claims in court. Therefore, Efron is precluded by
the FINRA arbitration from relitigating all claims relating to the
interpretation of the Master Account Agreement and UBS' claim for
indemnification, that is, Counts I, V, VI and VII of the Complaint.
Not only did Efron have a full opportunity to litigate these claims
before the arbitrators, but he fully took advantage of that
opportunity as is reflected in the record.

Notwithstanding, there are claims brought by Efron that were
not arbitrable. Specifically, Efron's claims relating to UBS's
2005 production of account records to Candelario and the 2007
liquidation of Efron's accounts, which were contained in his
Counterclaim and in Counts II and III of his Complaint. Although
the subject matter and underlying facts of these claims were part

of the prior <u>Candelario v. Efron</u> and <u>Candelario v. UBS</u> litigation

both in state and federal court, the Court deems that they are not

precluded by the *res judicata* doctrine. Efron was not a party to

the <u>Candelario v. UBS litigation</u>, and was denied intervention,

hence, he did not have full and fair opportunity to litigate these

specific matters. In the <u>Candelario v. Efron</u> litigation, though he

was a party, he did not have an opportunity to litigate these

claims. However, the Court deems that Counts II, III and IV of

the Complaint were not properly brought before this Court, as

discussed below.

B.    <u>Enforceability of the Forum Selection Clause</u>

Defendants also base their Rule 12(b)(6) request for

dismissal on the forum selection and choice of law clauses

contained in the Master Account Agreement. In this case, the

Complaint and all the claims are related in some way to the Master

Account Agreement between UBS and Efron. In that sense the Master

Account Agreement is referenced by Efron throughout the

allegations of the Complaint. *See* (Docket No. 1 at 4; 6 ¶¶ 10, 13;

14 ¶¶ 56, 57; 24 ¶ 101; 26 ¶ 110).

However, Efron argues that the Master Account Agreement's

forum selection clause is unenforceable since "the Southern

District of New York is not a forum agreed to by Efron[.]" (Docket

No. 22 at 3-4). He also contends that the choice of law clause is

unenforceable "where there is no nexus between the chosen law and

the facts of the case." (Id. at 19). In sum, Efron posits that "the forum selection and choice of law clauses were the product of surreptitious conduct on the part of UBS. UBS drafted the MAA, which was not subject to negotiation with Efron and is a contract of adhesion." (Id. at 12).

Pursuant to the Supreme Court of the United States' seminal opinion in M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972) "[t]he prevailing view towards contractual forum selection clauses is 'that such clauses are prima facie valid unless enforcement is shown by the resisting party to be unreasonable under the circumstances.'" Silva v. Encyclopedia Britannica, Inc., 239 F.3d 385, 386 (1st Cir. 2001) (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. at 10). In the First Circuit, there are three steps to determining the enforceability of a forum selection clause pursuant to federal law. See Blue Ocean Intl. Bank LLC v. Golden Eagle Capital Advisors, Inc., 408 F.Supp.3d 57, 64-65 (D.P.R. 2019) (quoting Autoridad de Energía Eléctrica de Puerto Rico v. Vitol S.A., 859 F.3d 140, 145 (1st Cir. 2017)).

1.    Permissive or Mandatory

"Under federal law, the threshold inquiry when analyzing a forum selection clause is whether the clause is permissive or mandatory." Claudio-De Leon v. Sistema Universitario Ana G. Mendez, 775 F.3d 41, 46 (1st Cir. 2014) (quoting Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 17 (1st Cir. 2009)). Mandatory

Civil No. 24-1168 (GMM)
Page -36-

clauses dictate "the exclusive forum for litigation" whereas
permissive clauses merely "authorize personal jurisdiction in a
designated forum, but do not prohibit litigation of covered claims
elsewhere." Rivera v. Kress Stores of Puerto Rico, Inc., 30 F.4th
98, 103 (1st Cir. 2022); *see also* Huffington v. T.C. Grp., LLC,
637 F.3d 18, 21 (1st Cir. 2011) ("A forum selection clause may
make the designated forum merely available for resolution of
disputes or it may make it 'exclusive,' at least in the sense that
either side can insist upon it as the venue.").

    Whether a choice of forum clause is considered mandatory or
permissive "often hinges on whether the provision includes any
terms with a mandatory connotation." Haddock-Acevedo v. Bd. of
Governors of Univ. of Puerto Rico, 615 F.Supp.3d 78, 83 (D.P.R.
2022). The First Circuit has repeatedly found that the use of the
term "shall" in a forum selection clause is indicative that the
clause is mandatory. *See* Claudio-De Leon, 775 F.3d at 46 ("[I]t is
axiomatic that the word 'shall' has a mandatory connotation.");
Centro Medico de Turabo, 575 F.3d at 17, n.5 (noting that "shall"
is a typical mandatory term); Summit Packaging Sys., Inc. v. Kenyon
& Kenyon, 273 F.3d 9, 12 (1st Cir. 2001) ("the plain meaning of
the phrase "will be submitted" is that the course of action is
required, not discretionary."). Furthermore, a clause is deemed
mandatory when the parties select one forum to the exclusion of
another. *See* Kress Stores of Puerto Rico, Inc., 30 F.4th at 103;

<u>Redondo Const. Corp. v. Banco Exterior de Espana, S.A.</u>, 11 F.3d 3, 5-6 (1st Cir. 1993); *see also* <u>Samalot-Martinez v. Norwegian Cruise Line Holdings, Ltd.</u>, No. CV 23-1514(RAM), 2024 WL 310408, at *1 (D.P.R. Jan. 26, 2024). Once a clause is deemed to be mandatory, there is a presumption that it should be enforced and the party resisting enforcement has the burden of establishing that enforcement is unreasonable and unjust or that the clause is invalid for reasons of fraud of overreaching. *See* <u>Centro Médico de Turabo, Inc.</u>, 575 F.3d at 18.

In this case, the forum selection and choice of law clauses included in the Master Account Agreement read as follows:

> Applicable Law
> *This Agreement, its enforcement and the relationship between Client and UBS PaineWebber shall be governed by the laws of the State of New York, including the arbitration provisions contained herein, without giving effect to the choice of law or conflict of laws provisions thereof,* and shall be binding upon Client, Client's authorized agents, personal representatives, heirs, successors and assigns, provided that there is no inconsistency with the federal securities laws, and provided further in connection with any Card issued, the Cardholder Agreement shall be governed by federal laws and the law designated by the Card Issuer in the Cardholder Agreement. *In the event that the arbitration clause contained herein is found to be unenforceable, Client and UBS PaineWebber agree that they will, for purposes of determining all matters with regard to this Agreement, submit to the exclusive jurisdiction of the courts of the State of New York and the federal courts sitting in the Southern District of New York. Client also consents to service of process by certified mail to the Account's address of record and waives any forum non-conveniens and venue claims.* Client and UBS PaineWebber agree that if any term, covenant, condition, or provision of this Agreement is held to be invalid,

Civil No. 24-1168 (GMM)
Page -38-

> void, or unenforceable, the remainder of the provisions
> shall remain in full force and effect, and shall in no
> way be impaired or invalidated and shall be construed
> (to the maximum extent possible) in such a way as to
> give effect to the intent of the invalid, void, or
> unenforceable provision in question.

(Docket No. 18-2 at 17) (emphasis added).

As to the choice of forum clause, the wording is distinct from the choice of law text. The Master Account Agreement contains clear and unambiguous language that indicates that the parties agreed to litigate in the courts of New York *if* the arbitration provision was found to be unenforceable. The language preceding the forum selection clause describes a condition precedent to its applicability-that the arbitration clause is "found to be unenforceable." Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd., 559 Pa. 56, 739 A.2d 133, 139 (Pa. 1999) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." (*citing* RESTATEMENT (SECOND) OF CONTRACTS § 224)). The non-occurrence of this condition precedent renders the forum selection clause inapplicable.

Merriam Webster defines "finding" as "the result of a judicial or quasi-judicial examination or inquiry especially into matters of fact as embodied in the verdict of a jury or decision of a

court, referee, or administrative body."[5] Thus, the plain meaning of the phrase "found to be unenforceable" implies that a judicial or quasi-judicial body issued a ruling after the enforceability of the arbitration provision was contested. In this case, the record reflects that the enforceability of the arbitration provision was contested during the FINRA arbitration, specifically as to the arbitrability of the claims contained in Efron's Counterclaim. As Efron himself relates in his Opposition, UBS claimed that his Counterclaim could not be arbitrated because the 6-year eligibility had expired. (Docket No. 22 at 10). The FINRA arbitrators ruled in favor of UBS and dismissed Efron's Counterclaim pursuant to Rule 12206(b) of the FINRA Code of Arbitration Procedure ("FINRA Rule 12206(b)") that provides that "[n]o claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim." FINRA Rule 12206(b) also provides in part that "[d]ismissal of a claim under this rule does not prohibit a party from pursuing the claim in court." Therefore, the Court interprets that the FINRA panel found that the arbitration clause was unenforceable as to the claims contained in the Counterclaim. Thus, this finding makes the forum selection clause applicable.

---

[5] Merriam-Webster Unabridged Dictionary, http:// unabridged.merriam-webster.com/unabridged/finding (last visited March 6, 2025)

Civil No. 24-1168 (GMM)
Page -40-

Moving on to the next step of the inquiry, the wording
included in the forum selection clause indicates that the parties
agreed that "they *will*, for purposes of determining *all matters
with regard to this Agreement*, submit to the *exclusive jurisdiction*
of the courts of the State of New York and the federal courts
sitting in the Southern District of New York." The use of the words
"will" and "exclusive" unequivocally signal that the clause is
mandatory. *See* <u>Coronavirus Rep. v. Apple, Inc.</u>, 560 F.Supp.3d 632,
640 (D.N.H. 2021) ("A forum selection clause is 'plainly mandatory'
where it contains language—including the verb 'will'—clearly
indicating that jurisdiction and venue will lie exclusively in the
selected forum." (*quoting* <u>Autoridad de Energía Eléctrica v. Vitol
S.A.</u>, 859 F.3d 140, 146 (1st Cir. 2017))). Furthermore, the clause
adds that Efron also "waives any forum non-conveniens and venue
claims."

2.    <u>Scope of Forum Selection Clause</u>

The next question on enforceability of a forum selection
clause centers on the clause's scope. <u>Blue Ocean</u>, 408 F.Supp.3d 57
at 65. Focusing on the language of the clause itself, a court must
determine whether the clause encompasses the claims before the
court. <u>Id.</u>

Here, Efron does not argue that the forum selection or choice
of law clauses fail to encompass his claims. Efron only disputes
that his claims should be litigated in Puerto Rico and under Puerto

Civil No. 24-1168 (GMM)
Page -41-

Rico law as they were not addressed in arbitration. Regardless, it is clear that Efron's claims fall within the scope of the forum selection clause. The clause broadly encompasses "all matters with regard to this Agreement." The Court need not map out the outer bounds of that phrase to determine that Efron's claims —breach of contract, breach of fiduciary duty, and negligence-fit comfortably within it. Other courts have reached conclusions to the same effect when presented with similarly broad language. *See, e.g.*, Carter's of New Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 293 (1st Cir. 2015); Huffington, 637 F.3d at 21-23 & 23 n.4.

    3.    Reasonableness of Forum Selection Clause

    Finally, a forum selection clause's enforceability depends on whether "a strong showing" has been made that the clause should not be enforced. Carter's of New Bedford, Inc., 790 F.3d at 292; *see also* Claudio-de León, 775 F.3d at 48 (*quoting* Bremen, 407 U.S. at 10). The First Circuit has identified four reasons —known as the Bremen factors— a forum selection clause may be unenforceable:

> (1) the clause is the product of fraud or overreaching; (2) enforcement is unreasonable and unjust; (3) its enforcement would render the proceedings gravely difficult and inconvenient to the point of practical impossibility; or (4) enforcement contravenes "a strong public policy of the forum in which suit is brought, whether declared by statute or judicial decision."

Vitol, 859 F.3d at 145-46; Carter's of New Bedford, Inc., 790 F.3d at 292.

Civil No. 24-1168 (GMM)
Page -42-

As to this part of the inquiry, Efron first insists that UBS never provided him a copy of the Master Account Agreement and that therefore "the forum selection and choice of law clauses were the product of surreptitious conduct on the part of UBS." (Docket No. 22 at 12). Second, Efron argues that enforcing the forum selection clause would be unreasonable and unjust. He contends that his claims relate to Puerto Rico law and occurred in Puerto Rico and that New York "is a forum alien to all parties and is completely unrelated to the contractual issues of the case." (Id.). Efron also argues that the choice of law clause is against public policy because it forces him to waive his rights and remedies under Puerto Rico law. (Id. at 13).

Efron's first claim, that the clause is the product of fraud, is without merit. Although he reiterates that that he never received the Master Account Agreement, the Court notes that he made those same arguments during the FINRA arbitration, and the arbitrators addressed and rejected them. Even so, Efron's averments sounding in fraud are conclusory. The allegations do not describe fraud, and instead, merely insist that he never saw the Master Account Agreement and consequently the forum selection and choice of law clauses contained therein. Notably, Efron is an "experienced litigator," In re Efron, 746 F.3d at 36, who —as the record clearly reflects— agreed, as a condition of opening a UBS account, "to be bound by the terms and conditions contained" in

Civil No. 24-1168 (GMM)
Page -43-

the Master Account Agreement, which included the choice of law and
forum-selection clauses. Efron certainly is not a lay person
without resources and cannot validly make "[t]he assertion 'I
didn't know what was in the contract that I signed' [which] is
made by litigants frequently but almost never successfully. Absent
fraud, a person is deemed to know the contents of a contract that
he or she signs. . ." Centro Medico de Turabo, Inc., 575 F.3d at
20-21 (quoting Parler v. KFC Corp., 529 F.Supp.2d 1009, 1014
(D.Minn. 2008)). That logic applies here as well.

The overreaching argument fares no better. "'[A]lthough there
is some ambiguity as to the precise boundaries of what constitutes
'overreaching,' a nebulous concept at best,' [courts] understand
'overreaching' to refer to one party's unfair exploitation of its
overwhelming bargaining power or influence over the other party."
Id., 575 F.3d at 21 (quoting Haynsworth v. The Corporation, 121
F.3d 956, 965 (5th Cir. 1997)). "But the mere fact of this
inequality is not enough to render an agreement unenforceable...
There must be some evidence that the party has exploited this
bargaining power in a way that the courts will not tolerate." Id.
(citations omitted). Similarly, contrary to Efron's suggestion
that the forum selection clause is unenforceable because the Master
Account Agreement is a contract of adhesion, "overreaching must be
based on something more than the mere fact that the clause was a
'boilerplate' provision printed on the back of a form contract."

Civil No. 24-1168 (GMM)
Page -44-

Id. "[T]he fact that a contract was in boilerplate form will not, by itself, render it unfair or invalid." Id. (*quoting* Outek Caribbean Distrib., Inc. v. Echo, Inc., 206 F.Supp.2d 263, 267 (D.P.R. 2002)). Moreover, the mere fact that a contract is one of adhesion does not render it per se unenforceable, and "[m]ere inequality of bargaining power between two sides will not be enough to render a contract unenforceable." Outek Caribbean Distrib., Inc., 206 F.Supp.2d at 267; *see also* Nieves v. Intercontinental Life Ins. Co. of P.R., 964 F.2d 60, 63 (1st Cir. 1992) ("[A]dhesion does not imply nullity of a contract"). Without more, the Court finds Efron's argument that the forum selection clause is "overreaching" unavailing.

B.    Enforceability of the Choice of Law Clause

Choice-of-law clauses only differ from forum-selection clauses in that they are used to predetermine the governing law regarding any breach to the agreement rather than the forum for litigation. Nevertheless, with respect to choice-of-law clauses, the Supreme Court has not clearly addressed the issue of enforceability by federal courts. Some courts interpret Bremen to apply to both types of clauses; accordingly, these courts tend to apply the Bremen factors interchangeably to both choice clauses. *See, e.g.,* Aguas Lenders Recovery Group v. Suez, S.A., 585 F.3d 696 (2d Cir. 2009); Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (11th Cir. 1998). As is the case here, the usual scenario

is that choice-of-law clauses are packaged together with choice-of-forum clauses.

Puerto Rico courts generally find choice-of-law clauses valid. *See, e.g.,* Shelley v. Trafalgar House Public Ltd. Co., 918 F.Supp. 515, 521 (D.P.R. 1996) (collecting cases). A federal court with diversity jurisdiction applies the substantive law, including choice of law rules, of the forum state. *See* Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In contract and tort cases, Puerto Rico law follows the Restatement (Second) of Conflict of Laws. *See* Wadsworth, Inc. v. Schwarz-Nin, 951 F.Supp 314, 320 (D.P.R. 1996); In re San Juan Dupont Plaza Hotel Fire Litig., 745 F.Supp. 79 (D.P.R. 1990). Under the Restatement, the law chosen by contracting parties will apply to any issue "which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187. The Restatement presumes that the parties' choice of law applies unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) where application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Civil No. 24-1168 (GMM)
Page -46-

Auctus Fund, LLC v. Sunstock, Inc., 405 F.Supp.3d 218, 227 (D.

Mass. 2019) (*quoting* Restatement § 187(2)); Westernbank P.R. v.

Kachkar, 2009 WL 6337949, at *13 (D.P.R. Dec. 10, 2009)).

    1.   The Choice of Law Clause is mandatory

First, per its clear text, the choice of law clause in this

case is mandatory, rather than permissive. The clause expressly

states that the enforcement and the relationship between Efron and

UBS "*shall* be governed by the laws of the State of New York." The

use of "shall" evinces the clause's mandatory nature.

    2.   The Choice of Law Clause is broad

Second, that same wording shows a broad scope meant to apply

and include anything regarding the Master Account Agreement, and

thus includes Efron's claims before this Court.

    3.   Reasonableness of the Choice of Law Clause

Third, as to the reasonableness of the choice of law clause,

Efron's arguments regarding inconvenience and public policy are

equally unconvincing.

    a.   Enforcement does not contravene public policy

Efron concedes that his claims would be dismissed as untimely

under New York's statutes of limitations. However, applying

another jurisdiction's statutes of limitations pursuant to a

choice of law clause does not contravene fundamental public policy.

*See* Barnett v. DynCorp Int'l, LLC, 831 F.3d 296, 308 n.14 (5th

Cir. 2016). "[A] statute of limitations is not the kind of

fundamental public policy that must trump foreign choice-of-law."
Shimzu Corp. v. Dow Roofing Sys., LLC, 2013 WL 5513035, at *9 (D.
Mass. Sep. 27, 2013). "[A]s the Restatement states, "[t]he forum
will not refrain from applying the chosen law merely because this
would lead to a different result than would be obtained under the
local law of the state. . ." Id. (*quoting* the Restatement § 187
cmt. g). Contrary to Efron's arguments, public policy is furthered
by having parties abide by agreements they validly entered.
"[E]nforcement of valid forum selection clauses, bargained for by
the parties, protects their legitimate expectations and furthers
vital interests of the justice system". Scotiabank de Puerto Rico
v. Residential Partners S.E., 350 F.Supp.2d 334, 339 (D.P.R. 2004).

Furthermore, regarding the alleged untimeliness of Efron's
claims according to New York law and the arguments alleging that
Efron would be deprived of his rights: that is not the type of
"inconvenience" that is required by Bremen and applicable caselaw.
This is so, "especially [because] that inconvenience was known or
contemplated by the parties at the time of their agreement." In
re Mercurio, 402 F.3d 62, 66 (1st Cir. 2005) (*quoting* Royal Bed &
Spring Co. v. Famossul Industria e Comercio de Moveis Ltda, 906
F.2d 45, 49 (1st Cir. 1990)); *see also* New Moon Shipping Co. v.
MAN B & W Diesel AG, 121 F.3d 24, 33 (2d Cir. 1997) ("The language
used in the Supreme Court opinions focuses on the inconvenience of
the chosen forum rather than the effect of applying the law of the

Civil No. 24-1168 (GMM)
Page -48-

chosen forum."). "Statute of limitations considerations generally
are not appropriate when assessing the reasonableness of enforcing
a forum-selection clause." Dana Transport, Inc. v. PNC Bank, Natl.
Assn., No. A-0295-23, 2024 WL 3041114, at *6 (N.J. Super. App.
Div. June 18, 2024), leave to appeal denied sub nom. Dana
Transport, Inc. v. PNC Bank, 323 A.3d 526 (N.J. 2024); *see also*
United Steel Am. Co. v. M/V Sanko Spruce, 14 F.Supp.2d 682, 695
(D.N.J. 1988) (holding that a time-bar does not preclude
enforcement of a forum-selection clause because "the analysis does
not hinge on whether a clause is unreasonable in light of present
circumstances created by plaintiff's failure to file in the correct
forum.").

      b.   Restatement § 187 applied

     In employing the mandated test regarding the applicability of
the choice of law clause, none of the exceptions apply here. First,
there is a reasonable basis for New York to serve as the uniform
body of law governing the interpretation of the Master Account
Agreement as well as disputes between UBS affiliates and their
customers nationwide. Efron cursorily objects to New York as the
chosen forum and as the chosen law, but he does not demonstrate
the inconvenience of the contracted-to forum or suggest that the
inconvenience was not contemplated at the time of contracting.
Regardless, his objections would likely be unavailing considering
the Supreme Court's enforcement of faraway forum choices. *See,*

Civil No. 24-1168 (GMM)
Page -49-

*e.g.,* Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 594
(1991) (noting that "a cruise line has a special interest in
limiting the fora in which it potentially could be subject to
suit."). Likewise, in the security sales context, the First Circuit
has recognized that forum selection clauses serve the legitimate
interest of concentrating "all related litigation in a single
forum." Gonzalez-Morales v. UBS Bank USA, 63 F.Supp.3d 191, 197
(D.P.R. 2014) (*quoting* Huffington, 637 F.3d at 23). New York is
the location of one of the major U.S. securities exchanges and as
other courts have noted, it has a "highly developed body" of
commercial, financial and securities law—a fact that has been cited
as an "eminently reasonable" basis to apply its laws, even if the
parties lack a substantial relationship to New York. *See* Valley
Juice Ltd. v. Evian Waters of Fr., Inc., 87 F.3d 604, 608 (2d Cir.
1996); Gen. Ret. Sys. v. UBS, AG, 799 F.Supp.2d 749, 756-57 (E.D.
Mich. 2011) ("[I]t is reasonable in cases of complex financial
transactions for parties domiciled in different states to elect
New York law to govern their disputes."). Application of New York
law "ensure[s] uniformity in the interpretation of the contract,
and decrease[s] the legal costs associated with making individual
arrangements." Valley Juice, 87 F.3d at 608. Here, UBS as an entity
offering products to residents of multiple jurisdictions, has an
interest in limiting the fora in which it can be sued regarding
such sales and related contracts. Accordingly, UBS's contractual

requirement that litigation take place in New York and that New York law applies does not invalidate the forum selection and choice of law clauses on inconvenience grounds.

Second, the application of New York law does not violate a fundamental public policy of Puerto Rico. Even where a plaintiff pleads under Puerto Rico contract law, an unchallenged choice-of-law clause is controlling, and claims should be analyzed under the law chosen by the contracting parties. *See* Sanfeliz v. Chase Manhattan Bank, 2006 WL 3095657, at *2 (D.P.R. Oct. 27, 2006) (applying New York contract law rather than the Puerto Rico Civil Code). As discussed previously, the fact that Efron's claim may be barred by the statute of limitations as set forth by New York law does not mean that the choice of law clause included in the Master Account Agreement is invalid. Again, applying another jurisdiction's statutes of limitations pursuant to a choice of law clause does not contravene fundamental public policy. Here, Efron did not prospectively waive his rights or remedies by signing the Master Account Agreement. Apparently, as per his own admissions, he simply failed to exercise them within the applicable limitations period. *See* (Docket No. 22 at 4, 14, 27). As the late Judge Selya eloquently stated quoting Edmund Wingate, Maxims of Reason (1658), in one of the eleven cases of the related litigation: "The lesson to be derived is that '[t]he law ministers to the vigilant not to

Civil No. 24-1168 (GMM)
Page -51-

those who sleep upon perceptible rights.'" <u>In re Efron</u>, 746 F.3d at 32 (citations omitted).

Hence, Efron's arguments in his Opposition are nowhere near the requisite "strong showing" that either the choice of forum or choice of law clauses "are unreasonable under the circumstances." <u>Claudio-de León</u>, 775 F.3d at 48. Efron fails to offer any reason of weight for the Court to find that litigating in New York is too burdensome or would amount to a deprivation of an effective forum. The "unreasonable and unjust" reason for finding a forum clause unenforceable is "more demanding" than mere "convenience." <u>Huffington</u>, 637 F.3d at 24. Furthermore, the dispute here is not entirely local, as UBS is a corporation organized and existing under the laws of the state of Delaware, authorized to do business in Puerto Rico, but with physical address in New Jersey. The Court acknowledges that New York might be a less convenient forum than the District of Puerto Rico for Efron; however, as noted earlier, the inconveniences are unlikely to be substantial considering plaintiff's status as an experienced attorney and the conveniences of electronic filing. Efron is an experienced attorney with experienced counsel who are amply qualified to pursue his case in another federal district court such as the Southern District of New York. There is simply no reason of weight to ignore what the parties clearly agreed to in their Master Account Agreement.

Civil No. 24-1168 (GMM)
Page -52-

Accordingly, the Court finds both the forum selection clause and the choice of law clauses to be enforceable. Because Counts II and III bring new claims that are related to same core facts but were never directly addressed in the FINRA arbitration nor the state court litigation as they were dismissed as not arbitrable, they are not precluded through *res judicata*. However, all the allegations included in those claims —breach of implied contract and breach of fiduciary duty— neatly fall within the scope of the forum selection clause which applies "for the purposes of determining *all matters with regard to this Agreement*." As Counts II and III relate to the Master Account Agreement and the relation between UBS and Efron, as per the forum selection clause, those claims were improperly brought before this Court.

As to Count IV— claiming violation of right to privacy pursuant to the Constitution of Puerto Rico, by disclosing information regarding his account with UBS— is also a new claim that was not addressed in arbitration nor in state court litigation. This claim appears to be derivative of the breach of contract claim that adds a damages claim for an alleged constitutional violation. Specifically, Efron alleges that the "constitutional and legal obligations are implied and incorporated into Efron's contracts with UBS", that he "had a reasonable *contractual*, legal and constitutional expectation of privacy" and that "[a]s a result of UBS's negligent acts, and *breach of*

*contractual duties and obligations*" he suffered damages. (Docket No. 1 at 22 ¶ 87, 23 ¶ 89, 91-92) (emphasis added).

Thus, the claim included in Count IV too arises from the "enforcement and the relationship between [Efron] and UBS" as established in the Master Account Agreement and is, therefore, contemplated within the scope of the choice of law provision.[6] Further evidence arises from the Master Account Agreement itself, which includes a provision entitled "Non-disclosure of Confidential and Material, Non-public Information" that expressly addresses the right of privacy and that prohibits improper disclosure of information. *See* (Docket No. 27-1 at 60). Hence, since the choice of law provision controls, this claim would be governed by the laws of New York, and thus should be dismissed as such cause of action pursuant to the Constitution of Puerto Rico obviously does not exist under New York law.[7]

---

[6] The Court interprets Count IV to include a cause of action included within the scope of "its enforcement and the relationship between [Efron] and UBS," yet the Court notes that tort actions fall outside of contractual choice-of-law clauses where the choice-of-law clause is written to be narrow and limited to actions on the contract itself. Westernbank, 2009 WL 6337949, at *13 n.13 (*citing* Neuro-Rehab Assocs. v. Amresco Commercial Fin., L.L.C., 2006 WL 1704258, at *9 (D.Mass. June 19, 2006). However, "a number of courts have held that where 'the fair import of the provision' shows that the parties intended to include tort, then the contracting parties' tort claims do fall under the choice-of-law clause." Jiffy Lube Intern., Inc. v. Jiffy Lube of Pa., Inc., 848 F.Supp. 569, 576 (E.D.Pa.1994); Cerabio LLC v. Wright Med. Tech., Inc., 410 F.3d 981, 987 (7th Cir.2005); *but see* Kleiner v. Cengage Learning Holdings II, Inc., 66 F.4th 28, 33 (1st Cir. 2023). In this case, the juncture of contract and tort law is the lynchpin of the claim asserted in Count IV and the phrasing of the choice of law clause indicates it is encompassed within the provision.

[7] The Court notes that UBS addressed this matter in its Motion to Dismiss and signaled that Efron waived any related arguments, as he did not address this issue in his Opposition. *See* (Docket Nos. 18 at 23; 27 at 12).

Moreover, even if, *arguendo*, the Court were to apply Puerto Rico law, this claim would have to be dismissed as time-barred since it relates to events that occurred in 2005, that is, almost twenty years ago. Further, the claim was not asserted until Efron's RICO lawsuit in 2019. *See* Arroyo v. Rattan Specialties, Inc.*,* 117 P.R. Offic. Trans. 49, 117 D.P.R. 35, 76 (P.R. 1986) (noting that violations of the right to enjoy one's privacy under the Puerto Rico Constitution may be enforced through an action for damages under Art. 1802 of the Civil Code); P.R. Laws Ann. tit. 31, § 5141 ("A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done.")[8]; P.R. Laws Ann. tit. 31, § 5298 (one-year prescription period applies to "[a]ctions to demand civil liability for. . . for obligations arising from the fault or negligence mentioned in § 5141 of this title, from the time the aggrieved person had knowledge thereof."); *see also* Ahmad Hamdallah v. CPC Carolina PR, LLC, 556 F.Supp.3d 34, 49-50 (D.P.R. 2021), aff'd sub nom. Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1 (1st Cir. 2024)(*citing* P.R. Laws Ann. tit. 31, § 5141); Rojas v. Puerto Rico CVS Pharm., LLC, No. CV 19-1260 (PAD), 2022 WL 980878, at *3 (D.P.R. Mar. 31, 2022) (*citing* Ramos Lozada v. Orientalist Rattan

---

[8] Because the events regarding the alleged violations occurred before 2020, Efron's claims would be governed by the 1930 Puerto Rico Civil Code, if Puerto Rico law were to be applied. *See* Article 1815, 2020 Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 11720.

Civil No. 24-1168 (GMM)
Page -55-

Furniture, Inc., 130 D.P.R. 712, 1992 WL 755597 (P.R. 1992), which
establishes that a claim for damages arising from fault or
negligence in the performance of contract arises under P.R. Laws
Ann. tit. 31, § 5141). Consequently, in any case, Count IV of the
Complaint must be dismissed.

      C.   Enforcement of Choice of Forum Clauses under 28 U.S.C.
          1404(a)

      The appropriate enforcement mechanism when a choice of forum
clause provides for a federal forum, is found in 28 U.S.C. §
1404(a). *See* Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court
for Western Dist. of Texas, 571 U.S. 49, 59-60 (2013). This section
of the Judicial Code of the United States is a codification of the
*forum non conveniens* doctrine which provides that "[f]or the
convenience of parties and witnesses, in the interest of justice,
a district court may transfer any civil action to any other
district or division where it might have been brought or to any
district or division to which all parties have consented." 28
U.S.C. § 1404(a).

      The presence of a valid choice of forum clause alters the
usual § 1404(a) analysis in three ways:

> First, the plaintiff's choice of forum merits no weight,
> and the plaintiff, as the party defying the forum-
> selection clause, has the burden of establishing that
> transfer to the forum for which the parties bargained
> is unwarranted. Second, the court should not consider the
> parties' private interests aside from those embodied in
> the forum-selection clause; it may consider only public
> interests. . .Third, when a party bound by a forum-

Civil No. 24-1168 (GMM)
Page -56-

> selection clause flouts its contractual obligation and
> files suit in a different forum, a § 1404(a) transfer of
> venue will not carry with it the original venue's choice-
> of-law rules.

Atlantic Marine Const. Co., 571 U.S. at 63-64. Consequently, a district court may only consider arguments about public factors and "[b]ecause those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." Id. at 64. Among the public-interest factors district courts may consider are court congestion and the ensuing administrative difficulties, the interest in having localized controversies decided locally, and the interest in having diversity cases tried in a forum at home with the law. Id. at 63, n. 6 (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, n. 6 (1981)).

As discussed, Efron has not met the burden of establishing that transfer to the forum for which the parties bargained is unwarranted. "When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. . .In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain." Caribbean Restaurants, LLC v. Burger King Corporation, 23 F.Supp.3d 70, 78 (D.P.R. 2014) (quoting Atlantic Marine Const. Co., 571 U.S. at 66).

Civil No. 24-1168 (GMM)
Page -57-

## V.    CONCLUSION

For the reasons articulated, the Court finds that the mandatory forum selection clause, as well as the choice of law clauses contained in the Master Account Agreement signed by the parties are valid and enforceable. The Court further finds no "extraordinary circumstances unrelated to the convenience of the parties [that] clearly disfavor a transfer." Atlantic Marine Const. Co., 571 U.S. at 63-64. Accordingly, the Court **GRANTS** UBS's Motion to Dismiss and pursuant to 28 U.S.C. § 1404 orders the transfer of this case to the District Court for the Southern District of New York as to the surviving Counts II and III (except for the allegations regarding the indemnification and the FINRA arbitration). The remaining Counts I, IV, V, VI and VII of the Complaint, are dismissed with prejudice.

IT IS SO ORDERED.

In San Juan, Puerto Rico, March 31, 2025.


s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
United States District Judge